IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| In Re: ) | |
| ) | |
| Joel Robert Jenkins ) | CASE NO. 11-13815 |
| Traci Lynn Jenkins ) | |
| ) | CHAPTER 13 |
| Debtor(s)/Plaintiff(s) ) | |
| ) | |
| JOEL ROBERT JENKINS ) | |
| TRACI LYNN JENKINS ) | |
| ) | |
| Plaintiff(s) ) | |
| ) | |
| vs. ) | Adversary Proceeding No. |
| ) | |
| JPMORGAN CHASE BANK, N. A. ) | |
| Successor by merger to Chase Home ) | |
| Finance, LLC ) | |
| ) | |
| Creditor(s)/Defendant(s) ) | |

**COMPLAINT TO DETERMINE THE AMOUNT OF THE SECURED CLAIM OF
JPMORGAN CHASE BANK, N. A. Successor By Merger to
CHASE HOME FINANCE, LLC, AND/OR OBJECTION TO CLAIM #12 and
BREACH OF CONTRACT**

I.  PRELIMINARY STATEMENT

1. The Plaintiffs, Joel Robert Jenkins and Traci Lynn Jenkins, refinanced their home located at 312 Willow Creek Cove, Cleveland, TN 37323, on June 12, 2008, in the amount of $297,000.00, from First National Bank.

2. The servicing of the Plaintiffs' mortgage loan was transferred to the Defendant, JPMorgan Chase Bank, N.A. successor by merger to Chase Home Finance, LLC, on September 18, 2008, and continues to this date.

3. As set forth in more detail, for over two years, the Plaintiffs have endured an array of deceptive, misleading, and confusing practices imposed on them by the Defendant, along with breach of contract while attempting to have their loan modified through the United States Treasury's Home Affordable Modification Program ("HAMP"). This lawsuit complains of a systematic home loan servicing scheme that included hours of telephone runaround, misleading and inconsistent information, lost correspondence, sending and resending documentation to Chase, and extensive delay, all of which have documented costs, and forced the Plaintiffs to file a Chapter 13 Bankruptcy in an effort to save their home from foreclosure.

4. On July 15, 2011, the Debtors / Plaintiffs commenced a voluntary case under Chapter 13 Bankruptcy Code by filing a petition, which was assigned case number 11-13815 and an Order confirming their plan was entered August 24, 2011.

## II.  JURISDICTION

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding.

## III.  PARTIES

6. Plaintiffs, Joel and Traci Jenkins, are residents of Bradley County, Tennessee, at 312 Willow Creek Cove, Cleveland, TN 37323.

7. Defendant, JPMorgan Chase Bank, N.A. successor by merger to Chase Home Finance LLC, ("Chase") is a national banking association with corporate headquarters located at 270 Park Avenue, New York, NY 10017.

## IV. FACTUAL BACKGROUND

8. In 2008, Chase accepted $25 billion in funds, from the United States Government, as part of the Trouble Asset Relief Program ("TARP"), 12 U. S. C. § 5211.

9. Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Companies that accepted money under TARP are subject to mandatory inclusion in HAMP, as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

10. In July 2009, Chase entered into a contract with the U. S. Treasury agreeing to be a participating servicer in HAMP.

11. HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification.

12. When the Plaintiffs refinanced their loan in 2008, the interest rate on their mortgage was 6.375%, with a payment of $2,171.19 (to include P&I and Escrow).

13. The Plaintiffs started experiencing difficulty in late 2009 in making their mortgage payments.

14. Upon hearing that the Obama administration had made available to struggling homeowners a way to get their mortgage loan modified, the Plaintiffs called the Defendant in hopes of getting a reduced interest rate. After being transferred from one department to the next, the Plaintiffs were told, by the Defendant, that they did not

qualify for HAMP because they were not late on a payment and were instructed by the Defendant to wait until the 1st of the next month to make their payment then call back.

15. The Plaintiffs as instructed by the Defendant skipped a payment then called the Defendant. The Plaintiffs' information was taken over the phone and they were given a new modified payment of $1,759.32. They were also advised that they would receive a packet of information to fill out and return to the Defendant, as soon as possible.

16. The Plaintiffs received their packet from the Defendant, and submitted all required documentation back to them.

17. Under HAMP guidelines, if a borrower qualifies for HAMP, servicers will place the borrower in a trial period plan ("TPP"). The trial period is *three months* in duration and governed by terms set forth in the TPP Notice. *Borrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent modification.* (Emphasis added)

18. The Plaintiffs received their TPP and submitted the following payments (See **Exhibit 1**), by phone, to the Defendant:
    - TPP #1 for January, 2010 /
    - TPP #2 for February, 2010 / Confirmation # 24377911
    - TPP #3 for March, 2010 / Confirmation #24777681
    - TPP #4 for April, 2010 / Confirmation #25123023
    - TPP #5 for May, 2010 / Confirmation #25429183

19. The Plaintiffs had been previously advised by the Defendant that after ninety-day (90) days and if they made all their TPP payments, as required, their loan would be permanently modified.

20. The Plaintiffs received a call from the Defendant advising their modification request had been sent to underwriting to modify; however, upon information and belief, a trustee's notice of sale had been published in the newspaper.

21. The Plaintiffs received a letter, dated March 3, 2010, from the Defendant, Chase Home Finance LLC (OH4-7356) 3415 Vision Drive, Columbus, OH, stating "... your home may be eligible for a loan modification program." Attached to that letter was an acceleration warning advising they were in default a total of $10,934.25. (See **Exhibit 2**)

22. The Plaintiffs call the Defendant numerous times to enquire why they received this notice since they had made all contractual TPP payments successfully and believed their loan was now permanently modified. The Plaintiffs were transferred from one department to another and would only be told they needed to resubmit documents.

23. The Plaintiffs received a letter sometime in May, 2010, from the Defendant, stating their mortgage modification was almost complete but requested they submit 4506T-EZ and a Hardship Affidavit at a Homeowner Assistance Event to be held June 11 -15, in Atlanta, GA, which is a 2 ½ hour drive from the Plaintiff's home. (See **Exhibit 3**)

24. The Plaintiffs mailed their June, 2010, payment of $1,759.32 to the Defendant.

25. On or about June 10, 2010, the Plaintiffs received a letter from the Defendant, Chase Home Finance LLC (FL5-7734) PO Box 44090, Jacksonville, FL, stating "....they may be eligible for a loan workout." Attached to that letter was an acceleration warning advising the Plaintiffs were in default $13,121.10. (See **Exhibit 4**)

26. Per the request of the Defendant, the Plaintiffs faxed on June 22, 2010, to the Home Owner's Assistance department, the same documentation which they had previously sent

to the Defendant. (For the purpose of this Complaint, Exhibit 5 has been redacted) (See **Exhibit 5**)

27. On July 30, 2010, the Plaintiffs reviewed their credit report which reflected that the Defendant was continuing to report their payments late and reporting - "Paying under a *partial* payment agreement." (See **Exhibit 6**) The Defendant is required to identify the loan as "modified under federal government plan" to the credit reporting agencies.

28. On or about August 5, 2010, the Plaintiffs received a letter from the Defendant, Chase Home Finance LLC (FL5-7734) PO Box 44090, Jacksonville, FL, stating "....they may be eligible for a loan workout." Attached to that letter was an acceleration warning advising the Plaintiffs were in default $10,934.25. (See **Exhibit 7**)

29. The Plaintiffs continued to send in their modified loan payment of $1,759.32, on time, for the months of July, August, and September 2010.

30. On or about September 30, 2010, the Plaintiffs received a letter from Chase Fulfillment Center, PO Box 469030, Glendale, CO, stating, "We recently made an offer to you to participate in a modification program. This letter is to confirm that you are electing not to proceed with the modification either because you notified us that you do not wish to accept the offer or failed to accept the offer materials within the required time period." (See **Exhibit 8**)

31. The letter of September 30, 2010, was a generic letter generated to cause mortgagors confusion, as it did the Plaintiffs. The Defendant states in the letter, "**IF** you were previously on a Trial Period Plan....." suggesting that the Defendant does not take the time to check its records which would have or should have reflected that the Plaintiffs

had made nine (9) Trial Period Plan payments. The Plaintiffs, up to this point, had never been told that they did not qualify for a permanent modification.

32. On or about October 1, 2010, the Plaintiffs received a Notice of the Right to Foreclose from the Defendant, Chase Home Finance LLC (FL5-7734) PO Box 44090, Jacksonville, FL, stating it had the right to foreclose on the Plaintiffs property any time after sixty days from the date of this notice. (See **Exhibit 9**)

33. The Plaintiffs attempted to make their October 2010, payment by phone, however, was told by the Defendant that they had been dropped from the program and would not be able to accept the Plaintiffs' payment unless it was for the total amount to bring the loan current.

34. On or about November 1, 2010, the Plaintiffs received a FedEx package from the Defendant containing a thank you for requesting the Making Home Affordable (MHA) Program and request for documents to participate in the program. (See **Exhibit 10**)

35. The Plaintiffs faxed the required information to the Defendant on November 14, 2010.

36. The Plaintiffs received a letter dated November 17, 2010, from the Defendant, confirming they had received the Plaintiffs' request to participate in the MHA Program. (See **Exhibit 11**)

37. The Plaintiffs received a letter dated November 17, 2010, from the Defendant stating they did not receive all the required documentation, even though the Plaintiffs had faxed it to them on November 14, 2010.

38. This letter went on to say, "You are currently in a Trial Period Plan." Yet, the Defendants still refused to accept any trial period payments from the Plaintiffs. (See **Exhibit 12**)

39. The Plaintiffs received another request, dated December 11, 2010, stating the Defendant had not received all the required documentation necessary to complete their request for modification and would need to receive it within the next thirty (30) days. (See **Exhibit 13**)

40. The Plaintiff called, on December 17, 2010, the Defendant since they had, several times before, faxed or mailed all the required documents to the Defendant. After getting the runaround they were told they needed Traci's last two paystubs and proof of employment.

41. During 2010 alone, the Plaintiffs made in excess of forty (40) documented telephone calls to the Defendant, not counting the numerous faxes sent of duplicated items requested by the Defendant.

42. On January 4, 2011, the Plaintiff faxed to the Defendant the requested documentation. (See **Exhibit 14**)

43. The Plaintiffs received a letter, dated January 10, 2011, from the law firm of Wilson & Associates, PLLC stating they had been retained by the Defendant to initiate foreclosure proceedings. (See **Exhibit 15**)

44. The Plaintiffs received a Notice of Trustee's Sale, dated January 13, 2011, from the Defendant's counsel, advising that the Plaintiffs' home would be sold on February 14, 2011, at 3:30 p.m. (See **Exhibit 16**)

45. The Plaintiffs received a letter, from Defendant's counsel, dated January 14, 2011, which stated that Chase was committed to helping homeowners remain in their homes and to call for the various programs. (See **Exhibit 17**)

46. The Plaintiffs received a Reinstatement Form, from Defendant's counsel, dated January 20, 2011, advising the Plaintiffs they had until February 3, 2011, to pay $23,465.74, to reinstate their loan. (See **Exhibit 18**)

47. The Plaintiffs stayed in a state of confusion by the Defendant's actions of a constant barrage of requests, re-requests, possible foreclosure, foreclosure notice, information required, accepting payments, not accepting payments to pay in full and then to see that a Notice of Trustee's Sale had appeared in their local newspaper on January 20, 2011, January 27, 2011, and again on February 3, 2011, setting the sale of their home for February 14, 2011. (See **Exhibit 19**)

48. The Plaintiffs received a letter, from the Defendant, dated February 9, 2011, advising they did not qualify for a modification through HAMP or any Chase modification programs. The letter further stated the denial was based upon the Plaintiffs' current monthly housing expense was less than or equal to 31% of their gross monthly income. (See **Exhibit 20**)

49. The Defendant relied on information they collected in 2011, after they had breached their contract with the Plaintiffs in September, 2010, when they stopped accepting the Plaintiffs' modified payment of $1,759.32.

50. The trustee's sale, of the Plaintiffs' home, scheduled for February 14, 2011, did not proceed.

51. The Plaintiffs received another Notice of Trustee's Sale, from the Defendant, dated February 14, 2011, and setting the sale of the Plaintiff's home for March 21, 2011, at 3:30 p.m. (See **Exhibit 21**)

52. The Plaintiffs received a letter, from the Defendant, dated February 21, 2011, providing the Plaintiffs with information regarding the Home Affordable Foreclosure Alternative (HAFA) program and a packet for them to complete and send back to the Defendant. (See **Exhibit 22**) The Plaintiffs were given fourteen (14) days to complete.

53. On March 4, 2011, the Plaintiffs, even though beyond frustrated from the constant runaround the Defendants inflicted on them, they completed the HAFA packet and faxed it to the Defendant. (See **Exhibit 23**)

54. The Plaintiffs received a letter, from the Defendant, dated March 7, 2011, confirming receipt of the modification request under the Making Home Affordable (MHA) program which confused them since they had applied for the HAFA program. (See **Exhibit 24**)

55. Notice of the Trustee's Sale was published in the local paper on February 18, 25, and March 4, 2011. (See **Exhibit 25**)

56. The trustee's sale, of the Plaintiffs' home, scheduled for March 21, 2011, did not proceed.

57. The Plaintiffs received a letter from Defendant's counsel, dated April 5, 2011, advising that the debt of $316,073.93 had been accelerated. (See **Exhibit 26**)

58. The Plaintiffs received a packet from the Defendant, dated April 21, 2011, advising they were eligible for a Home Affordable Modification (HAM). If they complied with terms of the HAM trial period plan, the Defendant would modify their loan and waive all prior late charges that remained unpaid. However, this program offered an adjustable rate mortgage. (See **Exhibit 27**)

59. The Plaintiffs did not submit the HAM documentation to the Defendant, since the offer did not truly offer a permanent modification with a fixed rate. The Plaintiffs at this point

did believe the Defendant would not make good on any offer of permanent modification, since they had been going through this process for almost two years.

60. The Plaintiffs received a letter from the Defendant, dated June 7, 2011, confirming that since the Plaintiffs did not return the packet, they did not want to participate. (See **Exhibit 28**)

61. The Plaintiffs received from Defendant's counsel, dated June 16, 2011, a Notice of Trustee's Sale scheduled for July 18, 2011, at 3:30 p.m. (See **Exhibit 29**)

62. The Notice of Trustee's Sale was published in the local newspaper on June 21, 2011, June 28, 2011, and July 5, 2011. (See **Exhibit 30**)

63. On July 15, 2011, the Plaintiffs filed for protection afforded to them under Chapter 13 bankruptcy, (Case No. 11-13815) as a last effort to save their home.

64. The Plaintiffs' Notice of Chapter 13 Meeting of Creditors was set for August 16, 2011, and served on the Defendant. (See **Exhibit 31**)

65. No objections were filed and an Order was entered August 24, 2011, confirming the Plaintiffs' Chapter 13 Plan, to pay the monthly maintenance payment of $1,759.00, which is the modified payment given to them, by the Defendant, in or around January, 2010. (See **Exhibit 32**)

66. The Plaintiffs received a letter from the Defendant, dated November 1, 2011, advising them that they did not qualify for the HAFA program which the Plaintiffs applied for nine (9) months earlier. (See **Exhibit 33**)

67. On December 21, 2011, five (5) months after the Plaintiffs/Debtors filed their Chapter 13, undersigned counsel filed a claim on behalf of the Defendant, since the Defendant had not filed their own Proof of Claim. (See **Exhibit 34**)

68. The Defendant granted the TPP, the end of 2009, accepted nine (9) timely payments from the Plaintiffs, and based on the HAMP requirements - borrowers who make all trial period payments timely and who satisfy all other trial period requirements - will be offered a permanent modification. Upon information and belief, the Plaintiffs successfully met all HAMP requirements.

69. On April 9, 2012, the Defendant filed its Proof of Claim in the amount of $318,460.24, listing an arrearage amount of $37,990.16, which included alleged missed payments due from April 2010 -- July 2011 at $2,186.85 each. (See **Exhibit 35**)

70. As of the date of this Complaint, the Chapter 13 Trustee has paid the Defendant a total of $20,295.98 towards the monthly confirmed maintenance payment of $1,759.00.

71. The Defendant's claim does not give proper and timely credit for the modified payments they received up through September 2010. Instead, the modified $1,759.32 payments received were placed each month into "suspense" until it had sufficient funds to make a full payment pursuant to the original terms of the Loan, or to repay an escrow advance. By not properly applying these payments, interest would accrue on the loan at 6.375%. This handling of Plaintiffs payments had never been disclosed previously to them.

72. Had the Plaintiffs been aware that the Defendant never intended to permanently modify their loan they would have sought out other alternatives such as selling their home or refinancing with another lender.

73. The Plaintiff's claims are simple – when a financial institution enters into a contract in which it promises to modify a loan and prevent an unnecessary foreclosure, homeowners expect that promise to be kept. The Defendant, by accepting timely modified payments from January 2010, through September 2010, entered into a contract with the Plaintiffs.

74. The Defendant breached its contractual obligations by refusing to accept Plaintiffs' payments after September 2010, and has ignored its contractual obligation to modify the Plaintiffs' loan permanently.

75. Had the Defendant continued accepting the agreed upon modified payments from the Plaintiff then the Plaintiff, Joel Jenkins, who is a church Pastor and whose reputation is irreproachable would not have had to endure scrutiny and embarrassment brought on by the direct actions of the Defendant mishandling the Plaintiffs' modification, its breaches, broken promises, when his and his wife's name appeared in the newspaper nine (9) times announcing the foreclosure of their home.

76. The Plaintiffs, as responsible borrowers, with a desire to do the right thing approached the Defendant in trying to save their home. The Plaintiffs were given a modified payment. The Defendant stopped accepting the payments after the 9th modified payment was made. The Defendant on several occasions continued to offer false hope with loan modification packages and letters of congratulations. The Plaintiffs wanted to believe that the Defendant would help but after two years of waiting, supplying the Defendant with repetitive requested information and the threat of foreclosure on several occasions, the process had taken an emotional toll on the Plaintiffs and had no alternative but to file Chapter 13 bankruptcy to save their home.

77. Plaintiffs suffered damages including, but not limited to loss of credit, foreclosure notice, emotional harm, embarrassment and forced to file a bankruptcy which could have been avoided had the Defendant continued to remain true to the modified contract it offered the Plaintiffs by accepting nine (9) modified payments of $1,759.32, which the Plaintiffs' were led to believe would be a permanent payment amount.

78. Defendant breached the contract by posting Plaintiffs home for sale during the period of the loan application process causing the Plaintiff injury.

79. Plaintiffs seek actual damages and attorney fees of this court.

80. Defendant supplied false information to Plaintiffs.

81. Defendant did not exercise reasonable care or competence in obtaining or communicating information. The Defendant's process was misleading, as most documentation, including but not limited to the application packets and letters the Plaintiffs received came from different addresses, such as Jacksonville, Florida / Glendale, Colorado / Columbus, Ohio / Atlanta, Georgia, which sometimes overlapped. It is the left hand not knowing what the right hand is doing.

82. A home is uniquely valuable. It is the largest investment many people will make in their lifetimes. Misrepresentations that jeopardize a borrower's home are unconscionable and the damage is irreparable.

**WHEREFORE**, the Plaintiff prays that this Court will enter an Order:

1. Reducing the Defendant's claim from $318,460.24 to 292,119.56.
2. Require the Defendant to permanently modify the Plaintiffs' loan payment to $1,759.00 pursuant to the modification contract and the Order of Confirmation.
3. Awarding the Debtors compensatory damages of $100,000.00 and punitive damages of $100,000.00, plus attorneys' fees.
4. Requiring the Defendant to correct its records to reflect that the Debtors' mortgage account is current along with adjusting the loan payment.
5. Grant such other relief as Court finds necessary and just.

Dated: _July 13, 2012_

                RICHARD BANKS & ASSOCIATES, P.C.

By: _____
      Richard Banks, #000617
      Attorney for the Debtor(s)
      P.O. Box 1515
      Cleveland, TN 37364-1515
      (423) 479-41881
      Fax: (423) 478-1175