

**SIGNED this 12th day of March, 2013**

_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

JOEL ROBERT JENKINS and                        No. 11-13815
TRACI LYNN JENKINS                              Chapter 13

       Debtor;

JOEL ROBERT JENKINS and
TRACI LYNN JENKINS

       Plaintiffs,

v.

JP MORGAN CHASE BANK,                           Adversary Proceeding
N.A. successor by merger to                     No. 12-1066
CHASE HOME FINANCE, LLC

       Defendant.

1

# MEMORANDUM

The plaintiffs and debtors Joel Robert Jenkins and Traci Lynn Jenkins ("Plaintiffs" or

"Debtors") filed this adversary proceeding against Defendant JPMorgan Chase Bank, N.A.,

successor by merger to Chase Home Finance, LLC ("Defendant" or "Chase"). The Plaintiffs'

claims are breach of contract and/or promissory estoppel based on Chase's alleged promises

related to a modification of their mortgage. Plaintiffs further claim that the Defendant supplied

them with false information and made misrepresentations to them. They assert that they have

suffered damages, including loss of credit, foreclosure notices, emotional harm, embarrassment

and that the Defendant forced them into bankruptcy to save their home. [Doc. No. 1,

Complaint].[1]

Defendant moves to dismiss the Plaintiffs' Complaint for failure to state a claim pursuant

to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012. [Doc. No. 8]. It contends

that the Complaint fails to meet the pleading standards under Rule 8(a) of the Federal Rules of

Civil Procedure made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7008.

Next, Chase argues that the contract claim fails as a matter of law, that there was no agreement to

modify the Plaintiffs' mortgage, Chase's conduct did not create a contract, and that Chase did

not breach an agreement to refrain from foreclosing. Chase concludes its argument on contract

by contending that there is no basis for the amount of reduction in the claim amount. Next, Chase

argues that there is no basis for a claim of emotional distress, there are not sufficient facts alleged

for fraud, and that there is no basis for punitive damages.

The Plaintiffs oppose the motion to dismiss. [Doc. No. 13]. They argue that Chase's

filing of a motion to dismiss is contrary to the order of confirmation entered by this court on

---

[1] All docket entry reference numbers pertain to docket entries for Adversary Proceeding No. 12-1066, unless
otherwise stated.

August 24, 2011. Next, they argue that there is a legal basis for finding that the document signed

was a contract which Chase breached. Finally, they argue that issues regarding the interpretation

of the contract exist as a result of the agreement's ambiguity and therefore dismissal is

inappropriate.

The court has reviewed the briefing filed by the parties, the pleadings at issue, and the

applicable law and makes the following findings of fact and conclusions of law pursuant to Fed.

R. Bankr. P. 7052. The court has determined that it will GRANT in part and DENY in part the

motion to dismiss.

### I.      Background

Plaintiffs' claims revolve around their interactions with the Defendant following

refinancing of the mortgage related to their home located on 312 Willow Creek Cove, Cleveland,

TN 37323. They refinanced their mortgage on June 12, 2008 in the amount of $297,000 with

First National Bank. Complaint,¶ 1. First National Bank transferred the mortgage to Defendant

on September 18, 2008, and the Defendant continues to hold the Plaintiffs' mortgage. *Id.* at ¶ 2.

The Plaintiffs summarize their claims by alleging that:

> . . . for over two years, the Plaintiffs have endured an array of deceptive,
> misleading, and confusing practices imposed on them by the Defendant, along
> with breach of contract while attempting to have their loan modified through the
> United States Treasury's Home Affordable Modification Program ("HAMP").
> This lawsuit complains of a systematic home loan servicing scheme that included
> hours of telephone runaround, misleading and inconsistent information, lost
> correspondence, sending and resending documentation to Chase, and extensive
> delay, all of which have documented costs, and forced the Plaintiffs to file a
> Chapter 13 Bankruptcy in an effort to save their home from foreclosure.

Complaint, ¶ 3.

By way of background, the Plaintiffs allege that the Defendant accepted $25 billion in

funds from the United States Government in 2008 to participate in the government's Troubled

Asset Relief Program ("TARP"), 12 U.S.C. § 5211. Complaint, ¶ 8. The Plaintiffs assert that the U.S. Treasury Department implemented HAMP to provide loan modifications to certain homeowners struggling with loan payments as an alternative to foreclosure of their mortgage loans. *Id.* at ¶ 9. They assert that the Defendant contracted with the Treasury Department to participate in HAMP. *Id.* at ¶ 10.

According to the Complaint the Plaintiffs began to struggle to make their mortgage payments of $2,171.19 in 2009. Complaint, ¶ 13. At that time the interest rate on their mortgage loan was 6.375%. *Id.* at ¶ 12. The Plaintiffs contacted the Defendant when they discovered their difficulty in making their mortgage payment and inquired about a reduced mortgage interest rate. They were allegedly transferred from department to department and eventually informed that they were not yet eligible for HAMP because they were not late on any payments. *Id.* at ¶ 14. In order to be eligible for HAMP, the Plaintiffs then followed the Defendant's instructions and failed to pay their next payment. According to the Complaint in late 2009, the Defendant provided the Plaintiffs with a modified payment amount of $1,759.32 over the telephone and informed them that they would receive a packet of information in the mail to complete. *Id.* at ¶ 15.

The Plaintiffs did receive a packet of information sometime in late 2009. The Complaint refers to the Trial Period Plan ("TPP") that Defendant mailed the Plaintiffs to complete. *See* Complaint, ¶ 17. The Complaint asserts that the "trial period is *three months* in duration and governed by terms set forth in the TPP Notice. *Borrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent modification.*" *Id.* The Defendant has attached a copy of the TPP to its motion to dismiss. *See* [Doc. No. 9-1]. The first page of the package sent to the Plaintiffs states initially in bold

4

lettering, "You may qualify for a Home Affordable Modification Trial Period Plan – a way to

make your payment more affordable." *Id.* at p. 1. It then asserts in the next paragraph: "*If you

qualify under the federal government's Home Affordable Modification program and comply

with the terms of the Trial Period Plan, we will* modify your mortgage loan and you can avoid

foreclosure." *Id.* (emphasis added).  Further down the page, the letter states:

> The monthly trial period payments are based on the income information that you
> previously provided to us. They are also our estimate of what your payment will
> be IF we are able to modify your loan under the terms of the program. If your
> income documentation does not support the income amount that you previously
> provided in our discussions, two scenarios can occur:
> 1) Your monthly payment under the Trial Period Plan may change and you may
> have to restart the Trial Period; or
> 2) You may not qualify for this loan modification program
> If you do not qualify for a loan modification, we will work with you to explore
> other options available to help you keep your home or ease your transition to a
> new home.

*Id.* (emphasis in original). Further into the TPP documents in a section entitled "Important

Program Info," it states, "The Trial Period Plan is the first step. Once we are able to confirm your

income and eligibility for the program, we will finalize your modified loan terms and send you a

loan modification agreement . . . which will reflect the terms of your modified loan." *Id.* at p. 5.

The TPP itself indicates that it is "Step One of a Two-Step Documentation Process." *Id.* at p. 9.

    The Plaintiffs assert that they returned all the required documentation to the Defendant

sometime in either late 2009 or early 2010. Complaint, ¶ 16. They further contend that they made

five separate reduced TPP payments by telephone for the months of January through May 2010.

*Id.* at ¶ 18. At some unidentified time while they were making their payments, the Plaintiffs

assert that they received a call from someone representing the Defendant who informed them that

their modification request had been "sent to underwriting to modify." *Id.* at ¶ 20.

The Plaintiffs received a letter dated March 3, 2010 that explained that the Plaintiffs were in default on their mortgage and urged them to contact a telephone representative to discuss a loan modification program. [Doc. No. 1-2, p. 1]. By the court's calculation, this letter was received within the 3-month duration of the TPP. The second page of the letter informed the Plaintiffs that they were in default in the amount of $11,202.63 on their monthly mortgage payments. *Id.* at p. 2. The letter warns that "[i]f you fail to cure the default within thirty-two (32) days from the date of this notice, Chase Home Finance LLC will accelerate the maturity of the Loan, terminate your credit line if the Loan provides for revolving advances, declare all sums secured by the Mortgage immediately due and payable, and commence foreclosure proceedings, all without further notice to you." *Id.* at pp. 2-3.

Following their receipt of this letter, the Plaintiffs contacted the Defendant several times. They believed that they had made all required TPP payments and that their loan had been permanently modified. Complaint, ¶ 22. The only response they received was that they should submit more documents. *Id.*

Sometime in May 2010 the Plaintiffs received another letter from the Defendant indicating that the mortgage modification was "almost complete" but that they still needed to provide the Defendant with a completed Form 4506T-EZ and a hardship affidavit. [Doc. No. 1-3]. The Plaintiffs assert that they again mailed a modified mortgage payment of $1,759.32 to the Defendant in June 2010. Complaint, ¶ 24.

In a letter dated June 10, 2010, the Defendant informed the Plaintiffs again that they were possibly eligible for a "loan workout." Complaint, ¶ 25; [Doc. No. 1-4]. The letter further informed them that they were past due in the amount of $13,121.10 on their mortgage payments. *Id.* On June 22, 2010 the Plaintiffs faxed the Defendant the same documentation that they had

6

previously provided to the Defendant pertaining to their mortgage modification application,

including a hardship application and a completed tax return Form 4506T-EZ. [Doc. No. 1-5].

The Plaintiffs' credit report dated July 2010 noted that Defendant was reporting their

payments late and that the Plaintiffs were "[p]aying under a partial payment agreement."

Complaint, ¶ 27; [Doc. No. 1-6]. On August 7, 2010 the Plaintiffs received another letter from

Defendant that was highly similar to its prior letters indicating the Plaintiffs were in default and

might be eligible for a loan workout. [Doc. No. 1-7]. The Plaintiffs allege that they continued to

make their partial payment to Defendant for the months of July, August, and September 2010.

Complaint, ¶ 29.

In a letter dated September 30, 2010 the Defendant informed the Plaintiffs:

> Chase Home Finance LLC ("Chase") is writing in response to your recent
> request regarding a loan modification on the above-referenced account. We
> recently made an offer to you to participate in a modification through one of our
> available programs. This letter is to confirm that you are electing not to proceed
> with the modification either because you notified us that you do not wish to
> accept the offer or failed to accept the offer materials within the required time
> period.
>
> If you were previously on a Trial Period Plan making reduced payments,
> please be advised that the actual payment status under the original terms of your
> Loan will begin to be reported to the credit bureaus, which may result in negative
> credit reporting if you do not cure any delinquency. In addition, if your Loan was
> in foreclosure at the time of the Trial Period Plan Offer, the foreclosure process
> may resume without further notice. . . .

[Doc. No. 1-8].

The Defendant then sent the Plaintiffs a "Notice of the Right to Foreclose" dated October

1, 2010. [Doc. No. 1-9]. This notice stated in part:

> Chase Home Finance LLC ("Chase"), the holder of the mortgage, deed of trust, or
> other lien on your Property, has the right to begin the process of foreclosing on
> the debt and may sell your Property at public auction to satisfy the debt at any
> time after sixty (60) days from the date of this notice for a period of twelve (12)
> months, without sending you another notice.

7

> You should IMMEDIATELY contact Chase to discuss repayment options for
> which you may qualify or, if none are available, foreclosure alternatives such as
> short sale or deed-in-lieu of foreclosure. Failure to satisfy your payment
> obligations may result in loss of your home.

[Doc. No. 1-9].

The Plaintiffs assert that they attempted to pay their October 2010 mortgage payment

over the telephone, but the Defendant representative informed them that the Plaintiffs were no

longer in the trial payment plan program and that Defendant could not accept their payment

unless it was for the entire amount needed to bring the loan amount current. Complaint, ¶ 33.

In a package dated November 1, 2010 the Defendant sent the Plaintiffs information

pertaining to their "recent request for a mortgage modification through the Making Home

Affordable (MHA) Program." [Doc. No. 1-10]; Complaint, ¶ 34. The letter requested that the

Plaintiffs provide the requisite information via Federal Express before November 16, 2010 and

informed them that "[i]f you qualify, we will set up a Trial Period Plan with lower monthly

payments – and work with you to modify your mortgage loan permanently." [Doc. No. 1-10, Ex.

10]. The Plaintiffs assert that they faxed the Defendant the requested materials on November 14,

2010. Complaint, ¶ 35. In a letter dated November 17, 2010 the Defendant informed the

Plaintiffs that it had received the Plaintiffs' request for a modification under the Making Home

Affordable (MHA) program. [Doc. No. 1-11, Ex. 11]. The letter indicated language similar to

letters provided to the Plaintiffs in prior correspondence. For example, the letter states: "If you

meet the eligibility criteria, including submitting all of the required documentation, we will offer

you a Trial Period Plan. The monthly trial period payments will be based on the income

documentation that you provide. They will be an estimate of what your payment will be if we are

able to modify your Loan under the terms of the program." *Id.*

In another letter also dated November 17, 2010, Chase informed the Plaintiffs that they were currently in a Trial Period Plan and needed to provide Chase with additional documentation. [Doc. No. 1-12, Ex. 12]. The letter gave the Plaintiffs fifteen days to provide the requested information, including their request for modification and affidavit; completed 4506T-EZ Form; completed 4506T Form; two most recent pay stubs; most recent profit/loss statement; four months of most recent bank statements; and proof of any other income. *Id.*

Sometime in December 2010 the Plaintiffs again received a notice from Defendant informing them that they needed to submit more documents to complete their request for a home loan modification. [Doc. No. 1-13, Ex. 13]. When the Plaintiffs called to inquire about why they were still being requested to send documents, the Defendant representative informed them that the company needed Mrs. Jenkins' last two paystubs and proof of employment. Complaint, ¶ 40. The Plaintiffs assert that they made over forty telephone calls in 2010 to the Defendant, in addition to faxes and documentation sent to the Defendant in response to its requests for information. Complaint, ¶ 41. On January 4, 2011 the Plaintiffs again faxed the Defendant information it had requested. [Doc. No. 1-14, Ex. 14].

Sometime in January 2011 the Plaintiffs received a letter dated January 10, 2011 from a law firm indicating that it had been retained by the Defendant to initiate foreclosure proceedings. [Doc. No. 1-15]. Within three months of the call informing them that they were under a TPP, in a letter dated January 13, 2011, the same law firm informed the Plaintiffs that their house would be sold in a Trustee's Sale on February 14, 2011. [Doc. No. 1-16, Ex. 16]. However, a letter dated January 14, 2011 from the law firm informed the Plaintiffs that "Chase is committed to helping homeowners remain in their homes. This commitment involves numerous loan modification and home retention programs, as well as multiple Homeownership Centers throughout the United

9

States." [Doc. No. 1-17, Ex. 17]. The letter provided the Plaintiffs with a number to call to "learn more about the options available." *Id.*

The same law firm sent yet another letter to the Plaintiffs on January 20, 2011 stating that "[p]ursuant to your request, the amount to reinstate the loan as of the date of this letter is $23,465.74 . . . If you reinstate by February 3, 2011, we estimate the amount to reinstate the loan will be $23,848.47. Please note that this estimated reinstatement expires on February 3, 2011. If you want to reinstate the loan after February 3, 2011, you must contact us for a new reinstatement amount." [Doc. No. 1-18, Ex. 18].

The Plaintiffs assert that they were in a state of confusion over the Defendant's conflicting actions constituting "a constant barrage of requests, re-requests, possible foreclosure, foreclosure notice, information required, accepting payments, not accepting payments to pay in full and then to see that a Notice of Trustee's Sale had appeared in their local newspaper on January 20, 2011, January 27, 2011, and again on February 3, 2011, setting the sale of their home for February 14, 2011." Complaint, ¶ 47; [Doc. No. 1-19, Ex. 19].

Finally, in a letter dated February 9, 2011, Chase informed the Plaintiffs of why they did not qualify for a mortgage modification pursuant to HAMP. [Doc. No. 1-20, Ex. 20]. The letter states in part:

> We are unable to offer you a Home Affordable Modification because your current monthly housing expense, which includes the monthly principal and interest payment on your first lien mortgage loan plus property taxes, hazard insurance, and homeowner's dues (if any) is less than or equal to 31% of your gross monthly income (your income before taxes and other deductions). Your housing expense must be greater than 31% of your gross monthly income to be eligible for a Home Affordable Modification.
>
> We are unable to offer you a Modification because your Loan does not meet the eligibility requirements established by the applicable investor (the owner of your Loan).

10

[Doc. No. 1-20, Ex. 20]. The letter provided that the Defendant could foreclose on the Plaintiffs' home unless the Plaintiffs paid off their entire past due balance. *Id.*

The foreclosure sale did not occur on February 14, 2011, but the Plaintiffs received another letter dated February 14, 2011 from Chase's law firm setting the foreclosure sale for March 21, 2011.  [Doc. No. 1-21, Ex. 21]. In a letter dated February 21, 2011, Chase provided information regarding the Home Affordable Foreclosure Alternatives ("HAFA") program to the Plaintiffs, which included options such as a short sale or deed-in-lieu of foreclosure as alternatives to foreclosure. [Doc. No. 1-22, Ex. 22]. The Plaintiffs completed the package relating to HAFA and returned it to Chase on March 4, 2011. [Doc. No. 1-23, Ex. 23]. In a letter dated March 7, 2011, Chase informed the Plaintiffs that it had received their request for a modification under the Making Home Affordable ("MHA") program. [Doc. No. 1-24, Ex. 24]. The Plaintiffs allege that they were confused because they applied for the HAFA program and not the MHA program. Complaint, ¶ 54.

Although the foreclosure sale was published in the paper on February 18, 25, and March 4, 2011, it did not proceed as scheduled on March 21, 2011. [Doc. No. 25]; Complaint, ¶ 56. In a letter dated April 5, 2011, Chase's law firm informed the Plaintiffs that Chase had the right to accelerate their loan and that they owed $316,073.93 on their house. [Doc. No. 1-26, Ex. 26]. Chase sent the Plaintiffs another application package under the Home Affordable Modification ("HAM") TPP with a letter dated April 21, 2011. [Doc. No. 1-27, Ex. 27]. This package offered modification to an adjustable rate mortgage.

The Plaintiffs did not complete the HAM paperwork because they did not want a modification with an adjustable rate mortgage and did not believe they had the option of a

mortgage modification based on all of their previous interactions with Chase. *See* Complaint, ¶

59.  In a letter dated June 7, 2011, Chase informed the Plaintiffs that it was:

> . . . writing in response to your recent request regarding a loan modification on the
> above-referenced account. You recently requested that we evaluate your
> eligibility to participate in a modification through one of our available programs,
> including the government's Making Home Affordable Program. This letter is to
> confirm that you are electing not to proceed with the modification either because
> you notified us that you wish to cancel your request, or you failed to accept the
> offer materials within the required time period.

[Doc. No. 1-28, Ex. 28]. Another foreclosure sale was scheduled for July 18, 2011. [Doc. No. 1-

29, Ex. 29]. A notice of the sale was published in the local newspaper on June 21, June 28, and

July 5, 2011. [Doc. No. 1-30, Ex. 30]; Complaint, ¶ 62.

The Plaintiffs filed their petition for bankruptcy on July 15, 2011 to save their home. *See*

[Bankr. Case No. 11-13815, Doc. No.1]; Complaint, ¶ 63. The court confirmed the Plaintiffs'

Chapter 13 plan on August 24, 2011 which required the Plaintiffs to pay a monthly maintenance

payment of $1,759, the same amount as the modified mortgage amount. [Bankr. Case No. 11-

13815, Doc. No. 37] [Doc. No. 1-32, Ex. 32]. The plan stated that the arrearage was disputed and

"[s]ubject to objection to claim or adversary proceeding." *Id.* at p. 2.[2] Chase informed the

Plaintiffs that they were not eligible for the HAFA program due to their filing for bankruptcy

protection in a letter dated November 1, 2011. [Doc. No. 1-33, Ex. 33].

On December 21, 2011, Plaintiffs' counsel filed a claim on behalf of Chase because

Chase had not filed its own proof of claim. Complaint, ¶ 67; [Doc. No. 1-34, Ex. 34]. On April 9,

2012 Chase filed its own proof of claim in an amount of $318,460.24. [Doc. No. 1-35, Ex. 35].

Chase indicated that the amount necessary to cure the defaults was $37,990.16. *Id.* at p. 5. It

---

[2] The Plaintiffs contend in their brief that the confirmed plan results in a waiver of the Defendant's rights under the
Federal Rules of Bankruptcy Procedure and specifically, the Defendant's right to file a motion to dismiss. The court
disagrees. It finds that the language in the plan simply reserved the final resolution of the issue to this adversary
proceeding with all the procedural rights applicable to such proceedings.

claimed that the Plaintiffs had missed sixteen mortgage payments—from April 2010 to July

2011. *Id.* The Plaintiffs assert that the Chapter 13 Trustee has paid Chase $20,295.98 towards the

modified mortgage payments since the Plaintiffs filed their bankruptcy petition. Complaint, ¶ 70.

 The Plaintiffs allege that the Defendant has failed to give them proper credit for the

modified payments they made to Defendant through September 2010. They assert that:

> . . . the modified $1,759.32 payments received were placed each month into
> "suspense" until it had sufficient funds to make a full payment pursuant to the
> original terms of the Loan, or to repay an escrow advance. By not properly
> applying these payments, interest would accrue on the loan at 6.375%. This
> handling of Plaintiffs['] payments had never been disclosed previously to them.

Complaint, ¶ 71.

 The Plaintiffs allege that the Defendant breached its contract with them:

> The Plaintiff's [sic] claims are simple – when a financial institution enters into a
> contract in which it promises to modify a loan and prevent an unnecessary
> foreclosure, homeowners expect that promise to be kept. The Defendant, by
> accepting timely modified payments from January 2010, through September
> 2010, entered into a contract with the Plaintiffs.
>
> The Defendant breached its contractual obligations by refusing to accept
> Plaintiffs' payments after September 2010, and has ignored its contractual
> obligation to modify the Plaintiffs' loan permanently.

Complaint, ¶¶ 74, 75. The Plaintiffs claim that they suffered damages including loss of credit,

foreclosure notice, emotional harm, embarrassment, and a need to file bankruptcy. *Id.* at ¶ 77.

 In its memorandum in support of its motion to dismiss, the Defendant asserts that it never

promised to modify the Plaintiffs' mortgage:

> Since Modification Effective Date in this case was April 1, 2010, it follows,
> therefore, that the Trial Period extended from January 1, 2010, through March 31,
> 2010. Chase did not determine during the Trial Period that Plaintiffs qualified for
> a permanent modification, so it did not provide Debtors with a fully executed
> copy of the Modification Agreement prior to the Modification Effective Date.
> Accordingly, the Loan Documents were not modified and the Plan terminated on
> March 31, 2010. . . . Accordingly, as of April 1, 2010, the day after the Trial
> Period expired, the Plaintiffs' obligations reverted back to the contractual terms of

13

their Loan Documents and they were required to make ongoing monthly
payments in the amount of $2,186.85.

[Doc. No. 9, pp. 4-5, Brief in Support of Motion to Dismiss]. Plaintiffs continued to make

reduced monthly mortgage payments following their Trial Period, according to the Defendant.

*Id.* Chase alleges that it cancelled several foreclosure sales while it tried to work with the

Plaintiffs on an alternative to foreclosure, including sending them packages relating to MHA,

HAFA and a different Home Affordable Modification Program.

## II.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6), incorporated into adversary proceedings by

Federal Rule of Bankruptcy Procedure 7012(b), allows a party to move to dismiss a complaint

for failure to state a claim upon which relief can be granted.  Fed.R.Civ.P. 12(b)(6).  In

reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must

"treat as true all of the well-pleaded allegations of the complaint." *Bower v. Federal Express

Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)).  In addition, a court must construe all allegations in the

light most favorable to the plaintiff.  *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*,

948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has explained "an accepted pleading standard" that "once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955,

1969 (2007).  The complaint " 'must contain either direct or inferential allegations respecting all

the material elements to sustain a recovery under *some* viable legal theory.' "  *In re DeLorean

Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quoting *Scheid v. Fanny Farmer Candy Shops,

Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)).

In *Twombly* the Supreme Court emphasized that:

14

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his
> "entitle[ment] to relief" requires more than labels and conclusions, and a
> formulaic recitation of the elements of a cause of action will not do, . . . Factual
> allegations must be enough to raise a right to relief above the speculative level, on
> the assumption that all the allegations in the complaint are true (even if doubtful
> in fact).

127 S.Ct. at 1964-65 (citations omitted).  *See also, Papasan v. Allain*, 478 U.S. 265, 286, 106

S.Ct. 2932 (1986) (noting that "[a]lthough for the purposes of this motion to dismiss we must

take all the factual allegations in the complaint as true, we are not bound to accept as true a legal

conclusion couched as a factual allegation").

On a motion to dismiss the court can consider the complaint, as well as documents

attached to the complaint. *See Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 863 (6th Cir.

2012); *Bassett v, Nat'l Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008). Chase also

asks the court to take judicial notice of its TPP. It asserts that because the Plaintiffs' claims rest

in large part on the language of the TPP, the court should consider the language of the TPP itself,

even though it is not attached to the Complaint. The court notes that other courts have

determined that where the plaintiff relies on a TPP pursuant to HAMP, but does not attach a copy

of the TPP to the complaint, the court may take judicial notice of the TPP where the plan forms

the basis of several of the plaintiff's claims for relief. *Bassett*, 528 F.3d at 430; *Grill v. BAC*

*Home Loans Servicing, Inc.*, No. 10-CV-03057, 2011 WL 127891, at *3 (E.D. Cal. Jan. 14,

2011). The court will consider the terms of the TPP in its analysis.

### III.    Analysis

Chase first argues that Plaintiffs' Complaint fails to meet the pleading requirements of

Federal Rule of Civil Procedure 8(a), as incorporated into adversary proceedings by Fed. R.

Bankr. P. 7008. In Chase's motion to dismiss, Chase further contends that:

(1) Plaintiffs have failed to state a breach of contract claim as a matter of law;

(2) Plaintiffs have failed to state a claim for emotional distress;

(3) Plaintiffs have failed to plead fraud with particularity in accordance with Fed. R. Civ.

P. 9, as incorporated into adversary proceedings by Fed. R. Bankr. P. 7009; and

(4) If the court finds that Plaintiffs have stated a claim under contract or tort, they have

failed to state a claim for punitive damages. The court will take each contention in the order

presented.

### A.      Breach of Contract

To sustain a breach of contract claim, a defendant must plead all of the elements of a

contract. To plead a breach of contract claim under Tennessee law, a plaintiff must allege the

existence of an enforceable contract, a breach of the contract, and damages resulting from the

breach. *Life Med, Inc. v. AMC Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

Plaintiffs have alleged the existence of a contract between the parties, but did not attach a copy

of the written agreement. Defendant has attached the agreement which is a TPP agreement. The

TPP agreement contains numerous provisions, and the Plaintiffs contend the agreement created

an obligation to modify the loan and to act or forebear from acting in certain ways during the

lender's analysis of their eligibility for a modification. Defendant also relies on the terms of this

TPP agreement in support of its contention that there was no obligation to modify the loan.

As to the first breach, other courts around the country have already addressed claims

similar to the Plaintiffs' claims that the loan modification program under HAMP created an

obligation to modify the loan. In the majority of the cases, the courts have found that the

program does not. For example, in *Thomas v. JPMorgan Chase & Co.*, the district court

addressed whether the defendant breached a contract promising to modify a mortgage made by a

trial period plan. 811 F.Supp.2d 781 (S.D.N.Y. 2011). In that case the court analyzed multiple

claims brought by two plaintiffs on behalf of a class of similarly situated individuals, including

claims for breach of contract, promissory estoppel, fraud, and negligent misrepresentation. *Id.* at

786. As in this case the plaintiffs had been offered a three-month TPP through the HAMP

program. *Id.* at 787. The court describes TPP documents highly similar to the TPP documents at

issue in this proceeding. *Id.* The plaintiffs received documents entitled "Step One of a Two-Step

Documentation Process" on which the borrower represented that he was unable to afford his

mortgage payments, was in default or would be in default on the loan, and did not have income

or access to assets to pay the monthly mortgage payments. *Id.* The court found that the defendant

in that case had not entered into a valid contract with the plaintiffs:

> Plaintiffs argue that the TPP agreements constitute valid contracts for the
> permanent modification of plaintiffs' home loans, and that defendants breached
> these contracts by not offering them permanent loan modifications. Plaintiffs'
> claim, however, is contradicted by the express terms of the TPP agreements,
> which state that any permanent modification is subject to the subsequent approval
> of Chase, and the receipt of a signed modification agreement.
> Although the TPP does use some misleading language in stating that Chase "will
> provide [the borrower] with a Home Affordable Modification Agreement" if the
> borrower is in compliance with the TPP, it also unequivocally states that the TPP
> does not constitute a permanent modification of the original loan; . . . .

*Id.* at 796. The court explained that when the plaintiffs signed their TPP, they agreed that they

understood that the plan did not modify their loan documents and that their loan would not be

modified unless they met all of the requirements necessary for modification. *Id.* The court also

noted that the plan stated that the borrower needed to receive a fully executed copy of the

modification agreement prior to the modification effective date, and that the plaintiffs had never

received such a document. *Id.* The court noted that "[s]everal courts have already held that the

TPP does not constitute a binding contract for permanent modification." *Id.* (citing *Lund v.

CitiMortgage, Inc.*, No. 10-CV-1167, 2011 WL 1873690 at *2 (D. Utah May 17, 2011); *Grill v.

*BAC Home Loans Servicing, LP*, No. 10-CV-03057, 2011 WL 127891, at *4 (E.D. Cal. Jan. 14,

2011); *Brown v. Bank of N.Y. Mellon*, No. 10-CV-550, 2011 WL 206124 at *3 (W.D. Mich. Jan.

21, 2011); *Vida v. OneWest Bank*, No. 10-987, 2010 WL 5148473, at *15 (D. Or. Dec. 13,

2010)). *But see, Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) (holding that

mortgagor stated claim for breach of contract under HAMP TPP agreement related to mortgage

servicer's refusal to modify her mortgage).

      Other courts have found that a plaintiff does not have a right pursuant to HAMP to force

a defendant lender to modify a mortgage. *See e.g.*, *Freitas v. Wells Fargo Home Mortgage, Inc.*,

No. 11-3146-CV-SW-RED, 2011 WL 5524913, at *4 (W.D. Mo. Nov. 14, 2011), *aff'd by* 703

F.3d 436 (8th Cir. 2013). In *Lund*, a case relied on by the court in *Thomas*, the court noted that

"there is no private right of action under" HAMP. 2011 WL 1873690 at *2. The court continued

that:

> to the extent that Plaintiffs argue that they are entitled to a modification under
> HAMP, it must be rejected. Further, Plaintiffs' attempts to disguise their HAMP-
> based claims as a breach of contract claim fails for the same reason.
>
> The Court further finds that Plaintiffs' breach of contract claim fails on the merits
> because it contradicts the clear language of the HAMP Loan Trial Agreement.
> That document makes clear that the modification is subject to qualification and
> that the modification would not be made permanent until, among other things,
> Plaintiffs received a fully executed copy of a modification agreement. Here, there
> is no suggestion that Plaintiffs received a fully executed copy of a modification
> agreement.

*Id. See also, Shurtliff v. Wells Fargo Bank, N.A.*, No. 1:10cv165TS, 2010 WL 4609307, at *3

(D. Utah Nov. 5, 2010).

      In *Grill* the court examined the language of the TPP and determined that the plaintiff's

"claim that a binding contract existed between the [lender] and himself is contradicted by [the

lender's] exhibits." 2011 WL 127891 at *4. *See also, Brown*, 2011 WL 206124 at *3 (noting that

HAMP trial period plan never guaranteed the borrower a loan modification); *Vida*, 2010 WL

5148473 at *6 (noting that "there is uniform agreement that HAMP does not provide for a

private right of action" and that the TPP "is explicitly not an enforceable offer for loan

modification").

In *Salvador v. Bank of America*, the bankruptcy court described the current case law in

the following way:

> This conclusion [of finding no contract to modify the loan] is consistent
> with the decisions of other courts around the country which have considered
> breach of contract claims relating to the failure of a lender to provide permanent
> loan modification pursuant to a TPP agreement. As recently recognized by the
> United States District Court in Oregon in the case of *Lonberg v. Freddie Mac*,
> 2011 WL 838943 at *7 (D. Or. March 4, 2011):
>
> > Every court that has reviewed this issue has unanimously agreed
> > that a defendant's failure to provide a permanent loan modification
> > solely on the basis of the existence of a TPP does not sufficiently
> > state a breach of contract claim. . . .
>
> The courts in *Lonberg*, *Grill*, *Prasad*, *Jackson* and *Brown* all held that the
> language of the TPP agreements made clear that no binding contract existed until
> an actual modification agreement was signed. The language in the TPP
> Agreement at issue in this case is identical and the Court agrees with the
> reasoning of those cases.

456 B.R. 610, 619-20 (Bankr. M.D. Ga. 2011) (quoting *Lonberg v. Freddie Mac*, 776 F.Supp.2d

1202, 1209 (D. Or. 2011) and citing *Grill,* 2011 WL 127891, at *4; *Prasad v. BAC Home Loans

Servicing*, 2011 WL 127891 at *3-4 (E.D. Cal. Dec. 7, 2010); *Jackson v. Ocwen Loan Servicing*,

2010 WL 3294397 at *3 (E.D. Cal. Aug. 20, 2010); *Brown*, 2011 WL 206124).

This court agrees with these authorities that Chase was under no contractual obligation to

modify the Debtors' mortgage based on the terms of the TPP in this case, especially in light of

there being no allegation by the Plaintiffs that the reason they were rejected was incorrect. There

is no allegation that Chase's conclusion that the Plaintiffs were ineligible was wrong. However,

there are other agreements that the Debtors are alleging that Chase breached. They state a

plausible claim for relief that Chase breached its obligation under the TPP agreement to consider

their application timely and not to start foreclosure proceedings against them while their loan

modification application was under consideration.

In *Thomas*, the district court found that the TPP was a type of agreement. It noted that:

> Under the TPP agreement Chase would "suspend any scheduled foreclosure sale"
> while plaintiffs met their obligations under the TPP. But plaintiffs do not allege
> that Chase foreclosed on their homes while the TPP was in effect, nor that Chase
> did so before it notified plaintiffs that their applications for permanent
> modification had been denied. Thus Chase fulfilled all of its obligations under the
> TPP. Accordingly, plaintiffs' claim for breach of the TPP agreement is dismissed.

*Thomas*, 811 F.Supp.2d at 797. *But see, Salvador*, 456 B.R. at 619.

In contrast, in this case the Debtors have alleged that Chase did not suspend foreclosure

proceedings while the Debtors continued to receive information from Chase that they were still

being considered for a loan modification. *See* [Doc. Nos. 1-9, 1-15, 1-16, 1-19]. They allege

Chase sent foreclosure notices before it had finally informed the Debtors that they did not qualify

for a mortgage modification. *See id.*; [Doc.  No. 1-20]. Therefore, the Debtors allege that Chase

did not fulfill its obligation under the TPP to inform them of its decision regarding their loan

modification and to refrain from instituting foreclosure proceedings against them while they

were still being considered for HAMP relief. [Doc. No. 9-1, TPP, p. 7].

The decision in *Kiser v. Citimortgage* in instructive here. No. 3:11cv1428, 2011 WL

4699355 (N.D. Ohio Oct. 6, 2011). In that case the homeowners had been discharged of their

obligations under their mortgage due to a bankruptcy filed prior to the bank's foreclosure on

their residence. However, the homeowners continued to live in the home following their

bankruptcy discharge. *Id.* at *1. Following their discharge a lender contacted the homeowners

regarding modifying their mortgage through HAMP. Pursuant to a TPP the homeowners agreed

to make three reduced monthly mortgage payments and submit a financial information package.

*Id.* The court concluded that the lender agreed "either expressly or implicitly, to provide and

process the information packet during the initial three-month period." *Id.* The homeowners began

to make their new monthly payments in November 2009 and continued to make those payments;

however, the lender instigated foreclosure proceedings several months later. *Id.* The court

explained the circumstances:

> By then, though plaintiffs had consistently made their monthly payments,
> CitiMortgage had yet to send the information packet, despite plaintiffs' repeated
> requests that it do so. They stopped payment on their June, 2010, check.
> CitiMortgage told them they did not qualify due to failure to return the
> information packet—which plaintiffs had never received from CitiMortgage.

*Id.* In July of 2010, the lender reopened the homeowners' file and informed them they were not

in foreclosure. They then sent the homeowners the financial information package. The

homeowners returned the package, but the lender informed them it did not receive the completed

application. Following receipt of another information packet, the homeowners again sent the

requisite information to the lender.

However, that same month, September 2010, the homeowners received noticed of a

sheriff's sale. *Kiser*, 2011 WL 4699355 at *1. The lender told them it could stop the sale. In

October of 2010, the homeowners completed yet another financial information package. In

November of 2010, the lender requested more financial and tax information. In January of 2011,

the lender again informed the homeowners that it did not have enough information. The

homeowners eventually became frustrated with the process, stopped making payments and

moved out of the home. *Id.* The lender informed the homeowners that it was rejecting their

application for a modification because they failed to provide the information packet. It

subsequently sent a different, contradictory letter to the homeowners informing them that they did not qualify for a mortgage modification due to their income. *Id.* at \*2.

The homeowners brought a claim for breach of contract against the lender. *Kiser*, 2011 WL 4699355 at \*2. The lender moved to dismiss the homeowner's claim, and the court denied the motion to dismiss the breach of contract claim. *Id.* The homeowners alleged that the lender precluded them from qualifying for the loan modification because it intentionally delayed sending the financial information packet that was a requirement for obtaining the modification. The lender argued that the homeowners were merely complaining of not receiving a mortgage modification. *Id.* The court disagreed:

> . . . the breach of contract claim, as I read and understand the complaint, relates to CitiMortgage's failure to deliver the information packet in a timely manner, and then, once the plaintiffs had returned the packet (and each time thereafter they did so), failing to process it to determine whether they qualified for a modification.
>
> CitiMortgage also alleges that no contract was created. The complaint's allegations indicate otherwise: namely, that there was an agreement for plaintiffs to participate in the TPP. CitiMortgage had contacted them, offered to consider them for a mortgage modification and sent confirmation that they had agreed to participate in the TPP.
>
> Under that agreement, plaintiffs were to make reduced monthly payments and submit information on forms which CitiMortgage was to provide. CitiMortgage, for its part, was to provide the forms and, on their return, determine whether plaintiffs qualified for a mortgage modification. This was to occur within the TPP three-month period.
>
> Plaintiffs upheld their part of the bargain. CitiMortgage, according to the complaint, did not. CitiMortgage was to send them the information packet, but it did not do so for about eight months. Then it claimed never to have received plaintiffs' completed packet. Plaintiffs sent two more packets—which CitiMortgage also claimed never to have received. In the meantime, plaintiffs continued to make payments—albeit at an agreed reduced rate—on their mortgage even though the bankruptcy court had relieved them of their obligations under the underlying loan.

*Id.* at \*2-3.

The court finds that the facts alleged here are analogous to the facts alleged in *Kiser*. Here, the delay occurred in delivering a decision as opposed to delivering the initial package. The Debtors have also alleged that notices were sent that the court may infer started the foreclosure process. Like the court in *Kiser*, the court concludes that the Debtors have stated a case that Chase entered into a TPP agreement with the Debtors pursuant to which it had the obligation timely to consider their mortgage modification request, communicate its decision to the Debtors, and refrain from pursuing foreclosure options against the Debtor during the application review process. *See* [Doc. No. 9-1, TPP]. The Debtors complied with the terms of the TPP agreement that applied to them, they began making the modified monthly payments, and they provided Chase with the financial information it requested from them.

With respect to the allegations regarding whether those contractual obligations were breached, the Plaintiffs allege that the TPP agreement provided that collection actions would not go forward during the application process. *See* [Doc. No. 9-1, TPP, p. 7]. By instituting the foreclosure, Chase breached the terms of the agreement. There is no dispute that the Debtors participated in the HAMP program and that Chase did not respond to the Debtors regarding their ineligibility until February 9, 2011. Complaint, ¶ 48. Further, Chase began a foreclosure proceeding in January of 2011 prior to the notification of ineligibility. *Id.* at ¶¶ 43-44. Defendant argues that the TPP ended on March 31, 2010. [Doc. No. 9, Chase Memorandum, p. 11, Section C]. Plaintiffs counter this contention with allegations that Chase sent letters as late as December 2010 requesting more information pursuant to the TPP. *See* [Doc. No. 1-13]. While acceptance of the payments may not have created a modification of the loan, the facts as alleged create an issue of fact as to whether the term of the TPP had been extended, and if extended, whether instituting a foreclosure was a breach of the TPP.

The final contractual issue is whether there are sufficient factual matters, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). Plaintiff raises this issue with respect to the entire breach of contract claim and to the amount of damages in particular. The court has found the allegations regarding breach of contract insufficient to sustain the claim for mortgage modification, but sufficient to allow the Plaintiff to proceed on the other breaches alleged. The court agrees that the allegations made in support of the amount of reduction of the claim are not specific as to the dollar amount; however, there are allegations regarding foreclosures and increasing expenses, including interest and fees related to reduced payments, that would support a reduction in the claim if the court finds that there was a breach of the contract. Accordingly, the court concludes that the TPP agreement constituted a contract, although it was not a contract which obligated Chase to modify the loan. The Plaintiffs have sufficiently alleged a breach of that contract regarding notification and forbearance and subsequent damages, including increased fees and interest relating to their decreased TPP payments, to withstand a motion to dismiss on these contractual terms.

### B.      Claim for Infliction of Emotional Distress

The Plaintiffs do not respond to Chase's argument regarding their claim for emotional distress damages in their opposition to Chase's motion to dismiss. The Complaint does contain one paragraph on the "emotional toll" that two years of frustrating negotiations had on the Plaintiffs' lives. [Complaint, ¶ 76]. They allege that the bankruptcy would not have been necessary but for Chase's failure to adhere to its promise to modify their mortgage contract. However, the court has found that the Plaintiffs have not stated a claim that there was ever a contractual obligation to modify the mortgage, so the court will grant a dismissal of intentional

24

infliction of emotional distress arising from the failure to modify. As to the foreclosure notices,
Plaintiffs have alleged they were embarrassed.  However, the Plaintiffs also alleged that they
were struggling to make the mortgage payments when they first contacted Chase.

It is unclear whether the Plaintiffs are alleging a claim of intentional infliction of
emotional distress or just damages for emotional distress caused by Chase's alleged breach of
contract. To the extent that Plaintiffs are alleging infliction of emotional distress related to the
foreclosure, the court concludes that the Plaintiffs have failed to allege such a claim. Intentional
infliction of emotional distress requires: (1) intentional or reckless conduct; (2) "the conduct
must be so outrageous that it is not tolerated by civilized society"; and (3) the conduct needs to
result in "serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. Sup. Ct. 1997).  The
Plaintiffs have alleged conduct by Chase that could be perceived as reckless, but the court cannot
conclude that the running of foreclosure notices which may have caused embarrassment is such
outrageous behavior, "so extreme in degree, as to go beyond all bounds of decency, and to be
regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 623 (quoting
Restatement (Second) of Torts § 46 cmt. d (1965)). As one Tennessee court noted, "[a] breach of
contract, even if clear, is not by itself actionable under the tort of outrageous conduct, nor will a
negligent or inadvertent act give rise to such a claim." *Chandler v. Prudential Ins. Co.*, 715
S.W.2d 615, 623 (Tenn. Ct. App. 1986).[3]

To the extent the Plaintiffs are only seeking emotional distress damages for Chase's
alleged breach of contract, a claim for breach of contract alone will not support emotional
distress damages.  *See Johnson v. Woman's Hospital*, 527 S.W.2d 133, 141 (Tenn. Ct. App.
1975) (noting that "[t]he general rule is that punitive damages are not recoverable in a contract

---

[3] Intentional infliction of emotional distress and outrageous conduct are different names for the same cause of
action. *Bain*, 936 S.W.2d at 622 n.3 (citing *Moorhead v. J.C. Penney Co., Inc.*, 555 S.W.2d 713, 717 (Tenn. Sup. Ct.
1977).

action and neither are damages for mental anguish, since it is not in tort and there is no physical

injury"). In addition, at least one Tennessee court of appeals has determined that damages for

emotional distress are not available for the tort of fraudulent misrepresentation. *See Hodge v.*

*Craig*, No. M2009-00930-COA-R3-CV, 2010 WL 4024990, at *9 (Tenn. Ct. App. Oct. 13,

2010) (overruled in part by *Hodge v. Craig*, 382 S.W.3d 325, 336 (Tenn. Sup. Ct. 2012)).

Although the Tennessee Supreme Court subsequently reversed the appellate court decision, the

parties failed to raise on appeal the issue of whether emotional distress damages are available for

a claim of fraudulent misrepresentation. *See Hodge v. Craig*, 382 S.W.3d 325, 336 (Tenn. Sup.

Ct. 2012). Therefore, the court will GRANT Chase's motion to dismiss the Plaintiffs' claim for

intentional infliction of emotional distress and/or their request for emotional distress damages

pertaining to Chase's alleged breach of contract or fraudulent misrepresentation.

### C.     Allegations of Fraud

With respect to the last count that Chase requests to have dismissed, the Plaintiffs allege

that Chase's conduct over the course of the TPP was misleading and that Chase's statements

regarding the status of their loan modification were misrepresentations. In addressing the

Plaintiffs' allegations, Chase specifically refers to allegations made in paragraphs 80 – 82 in the

Complaint.

Chase contends that this sort of claim is in the nature of fraud and must be plead with

particularity. Fed. R. Bankr. P. 7009(b). "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). In order to

state a claim for fraud, the case law in Tennessee requires pleading four elements. They are: (1)

"an intentional misrepresentation of a material fact"; (2) "knowledge of the representation's

falsity"; (3) "an injury caused by reasonable reliance on the representation"; and (4) the requirement that the misrepresentation involve a past or existing fact. *Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992). If a claim is based on "promissory fraud," then the "misrepresentation 'must embody a promise of future action without the present intention to carry out the promise.'" *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). A claim of promissory fraud "is actionable when it can be established through competent evidence that the promise of future conduct was made with an intent not to perform." *Ray v. Williams*, No. W2000-03000-COA-R3-CV, 2002 WL 974671, at *4 (Tenn. Ct. App. May 9, 2002) (citing *Steed Realty v. Oveisi*, 823 S.W.2d 195, 199-200 (Tenn. Ct. App. 1991)). The second prong of a claim for fraud requires knowledge of the statement's falsity or " 'without belief in its truth,' or 'recklessly' without regard to its truth or falsity" *Ray*, 2002 WL 974671 at *3 (citing *Shahrdar*, 983 S.W.2d at 237).

To plead fraud under Fed. R. Civ. P. 9(b), a plaintiff must allege " 'the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " *U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)).

The Debtors allege Chase supplied them with false information. Complaint, ¶ 80. Although the Plaintiffs identify numerous dates when they received information verbally or in writing from Chase, they fail to identify which statements were false. There are no provisions of the TPP which are identified as false, only that there was a promise to modify the mortgages if certain conditions were met. Complaint, ¶¶ 14-19. The Debtors do allege that Chase, through its representations, made contradictory statements from the period March 2010 through February 9,

27

2011. One line of communication discussed eligibility for a modification, requested more

information to continue moving the process forward, stated that the loan had been sent to

underwriting for modification, and recognized that the Debtors were in a TPP. The other line is

composed of demand letters and foreclosure notices that contain no recognition of the Debtors'

participation in a TPP. Based on the pleadings the court cannot see how both are correct. One of

the lines of communication would seem to have to be a mistake; and due to the timing of the

communications, the court could infer that Chase knew that one of its positions was wrong. The

communications suggesting that the Debtors were still being considered for a loan modification

may have lulled them into believing that such a modification would happen and may have

encouraged them to continue paying the reduced mortgage amount. It is possible that Chase

knowingly or recklessly encouraged the Debtors to continue making the reduced TPP payments

even after it had the information with which it could have informed the Debtors that they would

not qualify for a mortgage modification pursuant to HAMP and had referred the loan to

foreclosure.

    For this reason, the court finds that the misrepresentations were pled with sufficient

particularity. The court can ascertain details regarding the dates of the letters of communication

from Chase that represented its various misleading and contradictory positions. Thus, the

Plaintiffs have adequately pled a claim for promissory fraud to survive Chase's motion to

dismiss. The court will DENY the motion to dismiss the Plaintiffs' fraudulent misrepresentation

claims. Having found that fraud claims will not be dismissed and that tort actions remain, the

court will not dismiss the claim for punitive damages.

### IV.    Conclusion

For the reasons stated *supra*, Chase's motion to dismiss will be GRANTED in part and DENIED in part. The court will DISMISS the Plaintiffs' claim relating to intentional infliction of emotional distress or emotional distress damages for breach of contract or fraudulent misrepresentation. The court will DENY Chase's motion to dismiss the Plaintiffs' breach of contract claim, although that claim is limited to the breach of the TPP, not a breach of an obligation to modify the mortgage. The court will further DENY Chase's motion to dismiss Plaintiffs' claim for fraudulent misrepresentation and their request for punitive damages.

A separate order will enter.

# # #